## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00266 (TSC)** |
| **v.** | : | |
| | : | |
| **STEPHANIE D. MILLER,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Stephanie Miller to two months of home detention, thirty-six months of probation, 60 hours of community service, $500 in restitution, and the $10 special assessment.

### I.    Introduction

The defendant, Stephanie Miller, and her husband and co-defendant, Brandon Miller, (collectively "the Millers") participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

Stephanie Miller pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating and Picketing in a Capitol Building. As explained herein, a sentence to home detention is appropriate in this case because of her (1) wrongful entry through a window by the Senate Wing door and (2) statements after January 6 showing pride rather than remorse or contrition for her criminal conduct. The government recognized that the Millers did not

1

personally espouse violence or property destruction and accepted responsibility early.
Nonetheless, their conduct, like the conduct of scores of other defendants, took place in the
context of a large and violent riot that relied on numbers to overwhelm law enforcement
officials, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many
others, the riot likely would have failed.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the
U.S. Capitol. *See* ECF 37 (Statement of Offense), at 1-7. As this Court knows, a riot cannot
occur without rioters, and each rioter's actions – from the most mundane to the most violent –
contributed, directly and indirectly, to the violence and destruction of that day.

*Brandon Miller's and Stephanie Miller's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, in what they characterized as a last-minute-decision, the Millers
traveled from Bradford, Ohio to Washington DC to attend a political rally on January 6, 2021 on
the National Mall. Following the rally, the Millers walked with a crowd to the U.S. Capitol.
Upon arriving at the Capitol, the Millers initially stood outside the building and observed people
climbing on the building's walls. The Millers eventually followed a line of law enforcement
officers in riot gear from a distance to make their way through the crowd to get to the Capitol
building.

The Capitol was initially breached by the Senate Wing door when a rioter kicked open a
window at approximately 2:13pm. Close to 45 minutes later, at approximately 2:56 p.m.
Brandon and Stephanie Miller both entered the U.S. Capitol by climbing through another broken

window at the same location in the Capitol. The Millers are circled in red in photos below when

helpful to identify them.





The Millers remained in the crowded hallway for a few minutes before walking toward

the Crypt.



The Millers passed through the Crypt at approximately 3:01p.m., walked through the

hallway by the Memorial Door and then walked into the hallway by the House Wing Door.







While walking from the Crypt through the Hallway by the Memorial Door, Brandon Miller broadcasted a video over "Facebook Live." The video pans around the Capitol and presents a first-person point of view of what Brandon Miller would have seen, including video of Stephanie Miller alongside him. At the start of the video, Brandon Miller states "We made it

inside the Capitol." Brandon Miller later claims over the video, "This is our building." At another point, a law enforcement officer appears to be directing people out of the building. While walking past the officer, Brandon Miller can be heard, under his breath, stating "ah, Fuck ya." Neither Brandon Miller nor Stephanie Miller appear to resist, confront or assault law enforcement officers.



After reaching the hallway by the House Wing door, the Millers retraced their steps, walking back through the hallway by the Memorial Door and into the Crypt. At approximately 3:06 p.m., the Millers again pass through the hallway by the Memorial Door, through the hallway by the House Wing Door, and through the Hall of Columns to exit the Capitol.







At approximately 3:07pm, the Millers departed the U.S. Capitol through an exit at the end of the Hall of Columns. The Millers were in the U.S. Capitol for just over ten minutes.

Facebook eventually froze Brandon Miller's account shortly after he broadcasted his live video inside the Capitol. Earlier, on January 6, 2021, he posted the following message on his account: "Don't believe what the news s telling you and were listening to it now and it is biased. I was there in DC. There is no way biden [sic] won."

Following his entry into the Capitol, Brandon Miller shared a number of direct messages with his Facebook friends, in which he described his travels to Washington D.C., what happened at the Capitol, leaving Washington D.C, and getting banned from Facebook. He also shared private messages with several friends about his participation in the Capitol Riot. For instance, on January 7, 2021, he wrote to one friend: "We was there it was peaceful yeah we got in the. Capital [sic] but wasn't burning down the city or destroying businesses just a couple broke windows in a taxpayers building they work for us". Also on January 7, he traded multiple

messages with another friend about the Capitol Riot.  He sent this friend a message stating "Went in the capital [sic] building" with the below photograph of himself and Stephanie Miller:



Mr. Miller and this friend further traded messages about the poor reactions people had against the rioters. When the friend wrote "I am getting attacked left and right", Brandon Miller responded, "Yeah I've seen that on Facebook … I can't believe people can't see what's going on in my opinion don't think nothing will change unless we have a revolution /civil war".

Brandon Miller also used his telephone to communicate with others about going into the Capitol. Brandon Miller had a lengthy text message exchange with one friend on January 6, 2021 about the Capitol Riot. When the friend suggested: "U better may [sic] low bro they going to look for anyone in tha [sic] building," Brandon Miller replied: "It's bullshit. We did nothing wrong." Later in the same exchange, the friend texted Brandon Miller, "It's time u were park [sic] of a real revolution brother," to which Brandon Miller replied, "Yeah Im glad I went".

Stephanie Miller likewise showed pride for her participation in going inside the Capitol. A search of her phone revealed several direct messages over Facebook with friends in which she discussed her participation in storming the Capitol. On January 8, 2021, she traded messages with a friend about the mixed reactions she and Brandon Miller received from people about going inside the Capitol. During the exchange, she wrote: "Thanks. Most of [sic] friends believe the same as we do. A few people talked shit, but they can fuck off. We don't care. We did hear they were using face recognition to find all the people that were inside the capital and wanting to charge them, so we're hoping we don't get charges, but we'll proudly take them if so". On January 14, she sent one friend a message, stating, "I enjoyed every part of what we did and was a part of. I honestly wouldn't have went if it weren't for brandon lol but It was an experience for sure".

*Stephanie Miller's Interview*

At the time of her arrest on March 12, 2021, Stephanie Miller made a voluntary statement to FBI agents, in which she admitted to entering the U.S. Capitol on January 6, 2021. She stated that she and Brandon Miller drove to Washington D.C. on January 5, 2021 in a last minute decision. After attending the political rally, they walked to the U.S. Capitol with the large crowd. While outside the Capitol, they saw people scaling the building's walls. She and Brandon Miller entered the U.S. Capitol by climbing through a window, which she observed had previously been broken. They returned to their home later that same day.

*Brandon Miller's post-guilty plea interview*

Pursuant to his plea agreement, Brandon Miller met with the FBI before his sentencing date to discuss his activities on January 6, 2021. During the interview, he explained that going to Washington D.C. for the political rally was a last-minute decision. On January 6, 2021, he and

10

his wife heard that people had gotten into the Capitol Building. While they were outside the Capitol, they saw police officers in riot gear making their way through the crowd to get to the Capitol. The Millers followed these officers from a distance as they approached the Capitol. Once next to the Capitol Building, Brandon Miller asked Stephanie Miller what she wanted to do, and she deferred to him. Brandon Miller said, "let's go in," and they entered the Capitol through a broken window. He estimated that they were inside the Capitol for 10-15 minutes.

*The Charges and Plea Agreement*

On March 9, 2021, the government charged Stephanie Miller by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On March 12, 2021, FBI agents arrested her at her home in Ohio. On March 30, 2021, Stephanie Miller was charged by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On September 10, 2021, she pleaded guilty pursuant to a plea agreement to Count Four of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. She agreed to pay $500 in restitution to the Department of the Treasury.

**III.    Statutory Penalties**

The Defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Ms. Miller faces up to six months of imprisonment and a fine of up to $5,000. She must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). As explained herein, the § 3553(a) factors weigh in favor of home detention in this case.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms. It was one of the only times in our history when the building was occupied by hostile participants. The attack defies comparison to other events. While each defendant should be sentenced based on their individual conduct, each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they would—at a minimum— have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, each defendant's individual conduct should be assessed on a spectrum. In fashioning a fair and just sentence, this Court should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the

defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive, they help to place each defendant on a spectrum as to their fair and just punishment. Had the defendant personally engaged in violence or destruction, he or she would be facing additional and more severe charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is not a mitigating factor in misdemeanor cases.

The Millers entry into the Capitol was clearly wrongful. Prior to entering, they had seen people climbing up the building's walls. In order to get close to the Capitol building, they followed a group of law enforcement officers in riot gear making their way to the Capitol. They entered the building just before 3:00 p.m. by climbing through a broken window next to the Senate Wing door. The room they entered was crowded and overflowing with other rioters. Ultimately the Millers were inside the Capitol for a relatively short period of time; nonetheless, in their persistence to enter the building, they clearly ignored multiple signs indicating it was wrongful for them to do so.

Stephanie Miller likewise sent private messages to people over Facebook that underscored her intent and pride for her actions. In one message, discussing potential criminal charges for having gone into the Capitol, Stephanie Miller expressed "we're hoping we don't get charges, but we'll proudly take them if so." In another message claiming she "enjoyed every part

of what we did and was a part of." These messages show that she failed to understand the gravity of her crimes or the riot in which she participated; moreover, they are clear indications she lacked any remorse for her actions following the Capitol Riot.

While the nature and circumstances of the offense supports a sentence of incarceration, for misdemeanor defendants who, like Stephanie Miller, committed fewer of the non-exclusive factors listed above, the government recommends a more lenient sentence. Accordingly, the nature and the circumstances of this offense establish the need for a sentence to home detention in this matter.

### B.  The History and Characteristics of the Defendant

Stephanie Miller is a 31-year-old woman who has been married to her husband and co-defendant, Brandon Miller, since July 14, 2018. Stephanie Miller has a thirteen-year-old son, who lives with her and Brandon Miller. The defendant works as a server at a winery and occasionally at a local bar.

Ms. Miller took part in a diversion program following an arrest for theft on December 15, 2020, which ultimately resulted in a fine of $100.  She was also previously arrested for forgery on August 31, 2009, for which she was granted Intervention in Lieu of Conviction and successfully completed the program requirements. She has a number of traffic infractions, including seven speeding tickets and four other traffic infractions.

The government also notes that Ms. Miller accepted an early opportunity to plead guilty, acknowledge her conduct and promptly resolve her case. Moreover, at the time of her arrest, she cooperated with the government and made a lengthy statement to FBI agents regarding her participation in the Capitol riot.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[1] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most important factor for this Court to consider and the most compelling reason to impose a sentence of incarceration. The violence at the Capitol on January 6 was intended to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

---

[1] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

> [D]emocracy requires the cooperation of the governed. When a mob is prepared
> to attack the Capitol to prevent our elected officials from both parties from
> performing their constitutional and statutory duty, democracy is in trouble. The
> damage that [the defendant] and others caused that day goes way beyond the
> several-hour delay in the certification. It is a damage that will persist in this
> country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was

seven months ago for the United States and our diplomats to convince other nations to pursue

democracy. It means that it will be harder for all of us to convince our children and our

grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see*

*United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on

this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the

Capitol, in a manner that delays the certification of the election, throws our entire system of

government into disarray, and it undermines the stability of our society. Future would-be rioters

must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United*

*States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument

can be made defending what happened in the Capitol on January 6th as the exercise of First

Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential

rioters—especially those who intend to improperly influence the democratic process—that their

actions will have consequences.

*Specific Deterrence*

Stephanie Miller's words and actions demonstrate a need for specific deterrence. While

she cooperated with law enforcement officials and has accepted responsibility for his actions, her

statements immediately following the riot showed a marked lack of understanding of her

lawlessness. Her statements that she would "proudly take charges" and "enjoyed every bit of

16

what she did and was a part of" show her utter lack of remorse at that time. Even though she claimed that it was her husband who took the lead in going to Washington DC and then into the Capitol, following others into criminal conduct – without exercising independent judgment to refrain from that conduct – warrants the need for punishment and specific deterrence...

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[2] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[3] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is

---

[2] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[3] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

In previous sentencing in January 6 cases, the government and the sentencing courts have made meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

The defendant has pleaded guilty to Count Four of the Information, charging her with Parading, Demonstrating and Picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social

media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—
help explain the differing recommendations and sentences. And as that discussion illustrates,
avoiding unwarranted disparities requires the courts to consider not only a defendant's "records"
and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse
or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C.
Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike
defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient
pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not
yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge
can do is consider those other sentences that do exist," and "[t]he comparable sentences will be
much smaller in the early days of any sentencing regime than in the later." *Id.*; *see generally*
*United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly
similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity'
in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail
'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses
and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A
sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the
Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity
analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed
on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C.
Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v.*

*Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police. Here, the government's recommendation would not result in an unwarranted disparity. While no previously sentenced case contains the same blend of aggravating and mitigating factors present here, the Court may also consider the sentence imposed on *Joshua Bustle*, 21-cr-0238 (TFH), which presents a similar sentencing recommendation for an individual who entered the U.S. Capitol at a later time, and/or initially expressed of lack of remorse but eventually entered a guilty plea at an early stage to accept responsibility. Judge Hogan sentenced Joshua Bustle to 24 months of probation and 30 days home detention. Notably, Stephanie Miller's case is more aggravating due to the messages found on her phone expressing her intent and pride on entering the Capitol.

The Court should also consider the sentence to be imposed on Brandon Miller. As of the filing of this memorandum, Brandon Miller and Stephanie Miller are scheduled to be sentenced at the same time. Although they participated in the Capitol Riot together, there are several

notable differences between them. Of the two, Brandon Miller is ultimately the one who motivated them to travel to Washington D.C. and decided to go into the Capitol Building. While Stephanie Miller was by all accounts a willing participant, as indicated by her messages, Brandon Miller appears to have led their entry into the Capitol. Additionally, Brandon Miller broadcasted their walk through the U.S. Capitol over Facebook, making a very public record and presentation of their criminal conduct. Finally, Stephanie Miller quickly admitted to the wrongfulness of her actions, admitting to agents that she entered the Capitol at the time of her arrest. As well, she expressed her intent to plead guilty and accept responsibility for his actions at the earliest opportunity to do so.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. After a review of those factors, the government recommends that the Court sentence Stephanie Miller to thirty-six

months of probation, including two months of home detention, 60 hours of community service,

$500 in restitution, and $10 special assessment.  Such a sentence protects the community,

promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a

consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:      /s/ Clayton O'Connor
CLAYTON H. O'CONNOR
Trial Attorney, Detailee
MD Bar No. 0512150005
555 Fourth St NW
Washington, DC 20530
clayton.oconnor@usdoj.gov
(202) 262-9895