UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ] | |
| | ] | Criminal No.  21-266 (02) |
| v. | ] | |
| | ] | Judge Chutkan |
| STEPHANIE MILLER | ] | |
| | ] | |

**SENTENCING MEMORANDUM**

Defendant Stephanie Miller, through undersigned counsel, respectfully submits the following memorandum in support of sentencing.  The defense requests that she receive probation, concurring with the recommendation of the Probation Office.

Ms. Miller pled guilty at the earliest opportunity to the misdemeanor count of parading, demonstrating, or picketing in a Capitol building.  40 USC § 5104(e)(2)(G).  This is one of the least serious offenses in the U.S. Code, with no applicable Guidelines, the available option of probation, and a maximum sentence of incarceration of 6 months.

### *I.  Sentencing Factors under 18 USC § 3553*

The factors under 18 U.S.C. section 3553(a) to be considered in imposing a sentence that is sufficient but not greater than necessary to comply with the purposes of section 3553(a) include:

(1) the nature and circumstances of the offense and the history and

1

characteristics of the defendant;

(2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the advisory guidelines range;

(5) any pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities; and

(7) the need to provide restitution to any victims of the offense.

The factors below relate to the appropriate sentence of the Court given all considerations in sentencing.

### A.    Full Acceptance of Responsibility

By pleading guilty, Ms. Miller has fully accepted responsibility for her actions, sparing the Court, government and witnesses the cost and time of trial and trial preparation.

Ms. Miller has fully cooperated with the government. This further shows that she takes responsibility for her actions and is remorseful. While she takes her responsibility seriously, at the same time, her responsibility is limited by law to a misdemeanor, and she should be sentenced in that context.

2

### B.     Early Acceptance of Responsibility

Ms. Miller pled guilty to the charge at the earliest opportunity.  She did not require additional time for the government and court by denying her involvement during the case, requiring expensive and lengthy discovery, or preparing for motions or trial.

Indeed, Ms. Miller gave a full statement to agents interviewing her at her initial arrest, fully admitting her culpability, including that she entered through a window.  She did this even prior to the appointment of legal counsel.

The government has quoted Facebook comments which Ms. Miller shortly after January 6.  In fact, in determining sentencing consideration for remorse, the Courts and Guidelines consistently focus on the defendant's behavior after the initiation of the criminal case, rather than prior to arrest. For example, under the U.S. Sentencing Guidelines (U.S.S.G.), sentencing level reductions apply to actions in pleading guilty after initiation of the case. U.S.S. G. § 3E1.1.   This makes sense, as it allows time for the defendant to reflect on the evidence, and her own conduct.  Defendants are not given a more punitive sentence for failure to show remorse prior to being charged.  Evidence of remorse after initiation of criminal charges  is key.  This encourages reflection and remorse, and focuses on the defendant's actions after a defendant has availed herself of her constitutional right to counsel through the initiation of the prosecution of the case.

### C.     Family History and Background

Ms. Miller had a very difficult family history, as noted in the presentence report.   Ms. Miller faced serious hardships as a teenager, as described in the presentence report, paragraph

42a, yet she persevered to make a productive life for herself and her family.   She works steadily, is an attentive mother, and has been in a stable 13-year relationship.

### D.   *Mental Health*

Ms. Miller's long term health issues are documented in the presentence report, paragraph 51.  As a direct result of her actions on January 6, 2021, she has been publicly scorned and humiliated; she had to resign from a job she enjoyed and was essential to support her family; and she has suffered from escalating health issues, as described in the presentence report, paragraph 51.  Despite this, and losing her full time job, she immediately applied for other jobs, and was able to obtain a new job - though part-time - within a short period of time.

### E.   *Circumstances of the Case*

Ms. Miller has absolutely no history of political extremism.   In fact, the decision to go to the District of Columbia was last minute, and for a rally called by the President of the United States.  She had never attended a political rally before January 6.  She had absolutely no expectation or desire to overthrow the government.  Rather, she was supporting the President in what he claimed were legitimate efforts to claim victory in the Presidential election.   During the rally, itself,  she responded to the President's call to "March to the Capitol...I'll march with you."  She joined hundreds of people marching to the Capitol.

She fully acknowledges that she never should have illegally entered the Capitol.  While she did not personally destroy anything, she illegally played a part in an unmanageable mob.  But she was not attempting to overthrow the government at that point, either.   Ms. Miller certainly is at the lowest level of illegal activity.   According to Ed Maguire, a criminologist at

Arizona State University, security forces are trained to ignore yelled insults and small acts of hostility, like pushes and thrown water bottles. And they receive training in absorbing surges in a crowd, moving people as gently as possible, and quickly responding to pockets of violence and isolating agitators.  Benedict Carey, Making Sense of the 'Mob' Mentality, New York Times (Jan. 12, 2021), available at https://www.nytimes.com/2021/01/12/science/crowds-mob-psychology.html She did not commit any of those actions.  On January 6 there was "[n]o clear structure in the crowd and absolute chaos on the police side: no clear sense of credible incident command, of wearing the right gear, carrying the right weapons. All of that seemed to be missing." Id.

Importantly, as for persons in the mob: "With no apparent structure or strategy, the crowd had no shared goal or common plan." Id.  Dr. James Jasper, a sociologist at City University of New York, noted, "Crowds do not act with one irrational mind... There are many groups, doing different things, for different reasons."  He further said, "There are great shots from the hall of statues, where protesters stayed inside the velvet ropes, like tourists, looking around sort of in awe." Id.  After Ms. Miller was on the Capitol grounds, she illegally went through the gap in security to go inside the Capitol, but did exit the Capitol when directed to do so.  Ms. Millers' actions should be penalized in relation to her own lack of planning.  While fully acknowledging that she illegally became a part of the mob, she was not there to overthrow the government, and is not charged as such.   Given her role in the events of that day, a sentence of probation is appropriate.

Tragically, when Ms. Miller was in a large crowd she decided to illegally follow the mob

rather than make an individual decision to leave.  Her accession to the mob - becoming a part

of something she would not have done individually, has subsequently caused havoc in her own

life, as described above.

### F.    The Impact of the Coronavirus Pandemic

The national emergency – going onto 2 years - has had a severe impact on the entire

nation, but our nation's prisons and jails have been particularly susceptible to illness and death.

Regardless of vaccination status, prisons are a cesspool for infectious disease.

This national emergency has hindered Ms. Miller's case, including her ability to meet in

person with counsel.

### G.    Sentencing Guidelines Range

The parties agree that the U.S. Sentencing Guidelines do not apply to this

misdemeanor conviction, with a maximum sentence of 6 months incarceration.

### H.    Rehabilitation

Post-arrest rehabilitation is an important consideration in sentencing under 18 USC §

3553.  The U.S. Supreme Court stated in <u>Pepper v. United States</u>, 562 U.S. 476,  (2011)(hat a

defendant's rehabilitation can be an important factor in sentencing under section 3553 in a

number of ways:  For example, evidence of rehabilitation:

> "...may also be pertinent to "the need for the sentence imposed"
> to serve the general purposes of sentencing set forth in §
> 3553(a)(2) --in particular, to "afford adequate deterrence to
> criminal conduct," "protect the public from further crimes of the
> defendant," and "provide the defendant with needed educational
> or vocational training . . . or other correctional treatment in the
> most effective manner." §§ 3553(a)(2)(B)-(D); <u>see</u> <u>McMannus</u>, 496

6

> F.3d, at 853 (Melloy, J., concurring) ("In assessing . . . deterrence,
> protection of the public, and rehabilitation, 18 U.S.C. §
> 3553(a)(2)(B)(C) & (D), there would seem to be no better evidence
> than a defendant's post-incarceration conduct"). Postsentencing
> rehabilitation may also critically inform a sentencing judge's
> overarching duty under § 3553(a) to "impose a sentence
> sufficient, but not greater than necessary" to comply with the
> sentencing purposes set forth in § 3553(a)(2)."
>
> Pepper, supra, at 491.

Since Ms. Miller's arrest she has done everything possible to continue to provide for her family and have a positive impact in her community, while fully accepting responsibility for her actions on January 6.

Attached is a letter from a past employer. The employer has been impressed with her work in the past, and seen the impact of this case on Ms. Miller.  She plans to re-hire Ms. Miller in a supervisory position.  Exhibit A.  Also attached are letters of support from family members. Exhibits B, C and D.   Importantly, Ms. Miller has written a letter to the court fully accepting responsibility for her actions, while determined to make more responsible decisions in the future.  Exhibit E.

I**.**      *Just Punishment*

Particularly during this pandemic, it is best for the community, as well as Ms.Miller,  that she continue her rehabilitation in the community.  She has a conviction which, in and of itself, is quite punitive.  The conviction affects possible job opportunities, and will remain with her for the rest of her life.  But probation will allow her to continue to work, show remorse and to help support her family - both financially and emotionally.

The Millers were arrested for this case at their home in the early morning, while Ms. Miller's 13-year old son was still asleep in bed.  She was arrested by multiple officers, with guns pointed at her.  As his mother, she had to apologize to her son for her actions.  She and Brandon Miller made that apology together.

Comparative sentences are addressed in Brandon Miller's sentencing memorandum, ECF 51, pp 6-7.  Given sentences imposed in comparative cases, a sentence of probation is appropriate here.

Probation involves significant restraints on a defendant's liberty.  Orders can confine defendants to a particular community, house, and job at the sufferance of the probation officer.  Jones v. Cunningham, 371 US 236, 242 (1963); *see also* Anderson v. Corall,  263 U. S. 193, 196 (1923) ("While [parole] is an amelioration of punishment, it is in legal effect imprisonment."); von Hentig, *Degrees of Parole Violation and Graded Remedial Measures*, 33 J. Crim. L. & Criminology 363 (1943).

Defendants must periodically report to the probation officer, permit the officer to visit their homes and jobs at any time, and follow the officer's advice.  Jones at 242.  Defendants are admonished to keep good company and good hours, work regularly, keep away from undesirable places, and live clean, honest, and temperate lives.  *Ibid*.  Not only must they faithfully obey these restrictions and conditions, but they also live in constant fear that a single deviation, however slight, might result in being sent to prison.  *Ibid*.

Defendants might be rearrested any time the probation officer only believes they have violated a term or condition of probation. *Ibid*. They might have to serve all of the time that was suspended with few, if any, of the procedural safeguards that normally must be provided to those charged with crime. *Ibid*. Probation significantly restrains defendants' liberty to do the things that free people in this country are entitled to do. *Ibid*.

### *II.  Conclusion*

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." <u>Gall v. United States</u>, 552 U.S. 38,52  (2007) <u>citing</u> <u>Koon v. United States</u>, 518 U.S. 81, 113 (1996).

Ms. Miller requests probation in this case, so that she can continue to work, provide financial and emotional support to her family,  and be a productive member of society. Particularly given her early acceptance of responsibility, and the unique circumstances of the case, there is no reason to believe that she would commit this offense in the future. A sentence of probation is sufficient in this case to protect the public, afford just punishment, and provide for rehabilitation.

Respectfully submitted,

_____/s/_____
Joanne D. Slaight, #332866
400  7th Street, N.W.,  Suite 206
Washington, DC  20004
Phone (202) 256-8969
Email:  jslaight@att.net

9